Matter of Baird v Kelly (2004 NY Slip Op 50394(U))

[*1]

Matter of Baird v Kelly

2004 NY Slip Op 50394(U)

Decided on March 29, 2004

Supreme Court, New York County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 29, 2004

Supreme Court, New York County
In the Matter of the Application of JEFFREY W. BAIRD, Petitioner, For a Judgment under CPLR Article 78
against
RAYMOND KELLY, as Police Commissioner of the City of New York, and as Chairman of the Board of Trustees of the Police Pension Fund, Article II, THE BOARD OF TRUSTEES of the Police Pension Fund, Article II, NEW YORK CITY POLICE DEPARTMENT and THE CITY OF NEW YORK, Respondent.
INDEX NO. 101889/03

Attorney for Petitioner: Jeffrey L. Goldberg, P.C., 2001 Marcus Avenue, Lake Success, NY 11042 Tele. No. (516) 775-9400
Attorney for Respondents: Michael A. Cardozo, Corporation Counsel of the City of New York, 100 Church Street Room 5-153, New York, NY 10007. By: Magda Deconinck, Assistant Corp. Counsel Tel. No. (212) 788-0752

LOUIS YORK, J.
Petitioner brought this Article 78 proceeding for an order (i) vacating respondents' decision to deny him a line-of-duty accident disability retirement allowance pursuant to NYC Administrative Code § 13-252 and, upon such vacateur, directing respondents to retire petitioner with a line of duty accident disability retirement allowance retroactive to the date of his service retirement, or, alternatively, either directing a factual hearing on the issues or compelling respondent Board of Trustees ("the Board") of the Police Department Article II Pension Fund (the "Pension Fund") to hold a hearing and allow petitioner to present evidence; and (ii) pursuant to CPLR 2307(a), directing respondent to serve and file meeting minutes, medical records and all other documents related to petitioner's retirement application.
Petitioner was appointed to the uniformed force of the New York City Police Department ("NYPD") on January 9, 1986, and joined the Pension Fund on the same day. He was assigned to Internal Affairs from 1988 to 1993. During that assignment he served as an undercover investigator for the Mayor's Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department (the "Mollen Commission"). He worked effectively and with distinction and was instrumental in exposing corrupt police officers and practices. After his work for the Mollen Commission concluded, petitioner was reassigned to NYPD's Department of Investigations ("DOI") to avoid reprisals at Internal Affairs.
According to petitioner (see statements at petitioner's exhibits A, GG), his reputation had [*2]preceded him and his coworkers and superiors at DOI referred to him as a "rat" from the beginning. Retaliatory actions by his superiors soon followed, ranging from the refusal to give him a DOI vehicle and other support needed to conduct his assigned investigations including processing for arrests, constant verbal abuse, assignment of the worst cases with little overtime potential, denial of earned promotions (see 5/26/94 Mollen letter to Bratton at petitioner's exhibit A) and training opportunities, and being partnered with another DOI "pariah." From May 1994 on, the hostility in his work environment escalated and petitioner began receiving anonymous letters at home containing offensive and obscene material. Petitioner attempted to get help from NYPD's Commissioner, but word of a clandestine meeting reached his superior at DOI, who confronted him and then spread the false rumor that he was spying on her and the DOI. This further exacerbated the situation, and led to his being patted down for listening devices and publicly humiliated, and later receiving the silent treatment from his coworkers. The few in DOI who were friendly with petitioner were told not to speak to him and received reprisals if they did.
In addition to working in that hostile environment, petitioner was the brunt of various incidents: the headset of his telephone was vandalized; a photograph of his daughter was stolen; obscene cartoons of him were circulated in the office; he received messages on his DOI beeper purportedly from his wife, his lawyer and Internal Affairs, all of which proved to be false; a newspaper clipping about the death of his lawyer, William Kunstler, was put in his DOI mailbox; unsolicited pornographic material was mailed to his home and his family. Each time petitioner reported one of these incidents he was threatened by his superiors. Petitioner's union representative divulged confidential personal information about his finances and family circumstances, and falsely spread the word that petitioner had psychological problems and was suicidal. When offered counseling by his superiors at DOI, petitioner denied the allegations and said that all his stress emanated from the constant harassment. In October 1995, petitioner was divested of his entire DOI caseload and transferred to a wholly operation at the Department of Transportation for a short-term assignment. While on that assignment he was summoned by his superior at DOI and told to report that same day to NYPD's Early Intervention Unit. When he got there he was told he had been referred by to the unit by an anonymous telephone call, and was let go without any intervention after an assessment interview.
In November 1995, petitioner filed a petition under the City's whistleblowing ordinance complaining of the harassment he had suffered in retaliation for having dared to storm the 'blue wall of silence' at NYPD. It is unclear what the outcome was. There are references from various parties stating that the City's Law Department, which conducted the investigation, found petitioner's allegations to be "not wholly unfounded" or "partially substantiated" but no official document has been furnished to the court. Attempts from public officials to help petitioner's situation (see, e.g., letter from Manhattan Borough President at petitioner's exhibit A) were apparently unavailing. In October 1996, while his complaint was still unresolved, petitioner began to see a psychologist, Robert E. Barton ("Barton"), on the advice of his family doctor, Marc Puchir ("Puchir"). In December 1997, petitioner was evaluated and began to be monitored by NYPD's Psychological Evaluation Unit. On the job, petitioner was going through a series of transfer assignments, with his condition generally improving whenever he worked with civilians and worsening when he had to work around NYPD personnel, often causing him to go on sick leave. Despite receiving treatment from his doctors, including medication, petitioner's anxiety and depression got progressively worse, [*3]and he was subsequently diagnosed by Barton as having chronic post-traumatic stress disorder caused by his work situation.
In 1998, petitioner applied for accident disability retirement based on post-traumatic stress disorder caused by "an intense campaign of harassment, isolation, and defamation resulting in a hostile work environment" (see petitioner's exhibit C). In the Fall of 1998, petitioner was hospitalized for a month and was diagnosed with depression and post-traumatic stress disorder. He returned to work on restricted duty, but he did not return to full mental health. In February 2000, NYPD's supervising chief surgeon recommended to the Police Commissioner that petitioner be referred to the Article II Medical Board (the "Medical Board") for evaluation since he was "not psychologically suitable for full duty police work" (petitioner's exhibit H). In response to this request, the Commissioner filed an application to retire petitioner for ordinary disability.
Petitioner was first examined by the Medical Board on March 27, 2000. The Medical Board found he had "a disability which would prevent him from performing the full duties of a New York City Police Officer in the foreseeable future" and unanimously recommended approval of the Police Commissioner's application for ordinary disability retirement. Without discussing the issue of causality, it cursorily recommended "disapproval of [petitioner's] application for Accident Disability Retirement. The diagnosis is Depressive Disorder" (petitioner's exhibit I). The Board remanded the matter to the Medical Board on various occasions (see petitioner's exhibits M, R, V).
Petitioner's doctors (Barton and Puchir) submitted letters in furtherance of petitioner's request for reconsideration, attributing his condition to his work at NYPD (petitioner's exhibits J, K, Z). Several other doctors also examined petitioner and diagnosed him as having post-traumatic stress caused by the harassment endured by petitioner at NYPD (see petitioner's exhibits L, N, Q), including the director of NYPD's Psychological Evaluation Unit (see respondents' exhibit 7). In addition to this medical evidence, petitioner submitted statetements from himself (petitioner's exhibits O, BB), letters from his lawyer (petitioner's exhibits S, U, X, AA, DD), and even a letter from former Mayor David Dinkins (see petitioner's exhibit CC).
 Upon each remand, the Medical Board recounted the evidence presented by petitioner and, without addressing the issue of causality, unanimously adhered to its initial determination (petitioner's exhibits P, T, W, Y, CC). Finally, the Board voted to approve petitioner's retirement for ordinary disability and denied petitioner's application for accident disability retirement. Petitioner asked that the Commissioner's application on his behalf be withdrawn and this Article 78 proceeding ensued (see petitioner's exhibits EE and FF).
"There is no doubt that the Administrative Code allows for an accident disability pension where only psychological injury is alleged" (Matter of Ervin [Brown], n.o.r., NYLJ Aug 23, 1991, p 21, col 3 [Sup Ct, NY Co, Nardelli, J, 1991]). To qualify for accident disability retirement petitioner must show that his psychological injuries were caused or precipitated by an accidental event. Disabling stress cumulatively caused by the nature of petitioner's undercover assignment would qualify him only for ordinary disability retirement (see id., citing Matter of Lichtenstein [Board of Trustees of the Police Pension Fund], 57 NY2d 1010, 1011-1012 [1982]). "[A]ccumulated on-the-job stress ... which occurs in the absence of an unexpected event and is the result of activity undertaken in the performance of ordinary employment, as here, does not constitute accidental injury within the meaning of ... the Administrative Code" (Matter of Impellizeri [Teachers' Retirement System of the City of New York], 173 AD2d 389, 390 [1st Dept 1991], lv den 78 NY2d 859 [1991]). [*4]The unfairness inherent in the current scheme of policemen's disability retirements when it comes to psychic injuries has been noted by appellate courts ruling that the precipitating line-of-duty event for a mental injury was not an "accident" as defined by the Administrative Code (see, e.g., Matter of Hipple [Ward], 146 AD2d 201, 208 [1st Dept 1989], lv den 74 NY2d 614 [1989]; Matter of Ervin [Brown], supra). Accident disability retirement is usually denied due to petitioner's failure to prove either the existence of an accidental line-of-duty event or that such event caused the disabling condition (see, e.g., Hipple v. Ward, supra). A petitioner must show that the disability is causally connected to a line-of-duty accident (Evans v. City of New York, 145 AD2d 361 [1st Dept 1988]). However, petitioner's application is not foiled by either of those pitfalls. Respondents do not dispute that petitioner's post-traumatic stress disorder arose out of the preposterous behavior he was subjected to as the aftermath of the undercover work he did for the Mollen Commission in uprooting corruption in the police department. Rather, they argue that petitioner's condition did not stem from an "accidental" event, and repeatedly cite to petitioner's failure to file any line-of-duty accident reports. This is pitiful indeed.
It is clear from the evidence before the court that petitioner's trauma was caused by a series of 'accidental' events, each one precipitating an onslaught of symptoms and further contributing to the deterioration of petitioner's mental health. These 'accidental' events were not the usual falls or other unanticipated physical injuries, but legally they do not have to be. Noting that the term 'accident' is not specifically defined by Admin Code § 13-252, the Court of Appeals has adopted "the commonsense definition of a 'sudden, fortuitous mischance, unexpected, out of the ordinary, and injurious in impact'" (Matter of Lichtenstein [Board of Trustees of the Police Pension Fund], supra, 57 NY2d at 1012; Matter of McCambridge [McGuire], 62 NY2d 563, 570 [1984]). It is undisputed that the shameful treatment suffered by petitioner had an 'injurious impact' on his mental health, and if each act of harassment and retribution that petitioner was subjected to can be deemed by respondents to be 'expected' or 'ordinary,' then our police force  and our society  are truly in dire straits.
Finally, the most significant factor militating in petitioner's favor is respondents' dereliction of duty. "If the Medical Board concludes that the member is disabled, it must further determine whether the disability is 'a natural and proximate result of an accidental injury received in such city-service' and certify its recommendation on this issue to the Board of Trustees" (Matter of Meyer [Board of Trustees], 90 NY2d 139, 144 [1997], rearg den 90 NY2d 936 [1997]). The medical board concluded early on that petitioner was disabled, yet it utterly failed to address the matter of causality. Petitioner's counsel wrote many letters movingly detailing petitioner's plight and urging that the Medical Board be made to give a reason for its cursory denial of accident disability retirement. The Board specifically remanded the matter to the medical board for a finding on causality. All to no avail. In each and every occasion it considered petitioner's application, including in response to the Board's specific request, the medical board merely adhered to its initial determination without addressing the question of causality. This adamant refusal to give a reason for its denial of petitioner's application, readily reminiscent of the treatment from co-workers and superiors suffered by petitioner, is per se arbitrary and capricious.
To make matters worse, there is no evidence before the court that the Board made its own determination as to causality; it appears that it merely 'rubber stamped' the medical board's arbitrary pronouncement. In this context it is interesting to note that a transcript of the October 9, 2002 Board [*5]meeting at which petitioner's application was denied has not been furnished to the court. The Board is "entitled to 'rely on the Medical Board's recommendations as to causation, an issue reflecting on matters of medical judgment, even in the face of conflicting evidence'" (In re Bates [Brown], 182 AD2d 574 [1st Dept 1992], citing Matter of Hipple [Ward], supra, 146 AD2d at 206-207). It can even rely solely "upon the experts credited by the Medical Board and ... reject the opinion of petitioner's experts" (Matter of Harris [Safir], 284 AD2d 220, 221 [1st Dept 2001]). However, the Board cannot do what it did here: take the cursory decree of the medical board at face value, unsupported by any credible evidence (see Matter of Meyer [Board of Trustees], supra, 90 NY2d at 147), and not even dignify the evidence submitted by petitioner with a discussion.
In short, NYPD subjected petitioner to an insidious 'death of a thousand cuts' in retaliation for his work on the Mollen Commission, with the Medical Board's refusal to even address the cause of his condition being the last gash (cf. Goode v. NYC Transit Police Department, 115 Misc 2d 541 [Sup Ct, NY Co, Price, J 1982], citing Rodriguez v. New York Dock Company, 256 App Div 875 [3d Dept 1939], rearg den 256 App Div 1014 [1939], lv den 280 NY 852 [1939]). This the court will not condone. Petitioner's idealism and moral fiber led him to do the right thing and work to expose police corruption; he should be lauded for his courage rather than destroyed by the system whose integrity he sought to preserve.
Based on the foregoing, the court finds that petitioner has met his burden of showing that the Board's determination was either capricious or arbitrary (see Matter of Christian [NYCERS], 56 NY2d 841, 843 [1982]). Since "the Medical Board failed to clearly set forth in its report[s] the reasons for its recommendation that the petitioner's application be disapproved" (In re Sailer [McGuire], 114 AD2d 334, 335 [1st Dept 1985], citing Matter of Curran [McGuire], 87 AD2d 223, 227 [1st Dept 1982]), the court finds that the Board's denial of an accident disability pension must be annulled as lacking a rational basis.
Accordingly, the petition is granted. Respondents' decision denying petitioner accidental disability retirement is hereby vacated and the matter is remanded to respondents for further proceedings in accordance with this decision.
This decision constitutes the judgment of the court.
DATED: March 29, 2004

 J.S.C.
Decision Date: March 29, 2004